# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| ERIC FRYE, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) C.A. No. 2020-0325-SEM |
| | ) |
| THE ESTATE OF MARVYN RAPHAELSON, | ) |
| | ) |
| | ) |
| Respondent. | ) |
| | ) |
| THE ESTATE OF MARVYN RAPHAELSON, | ) |
| | ) |
| | ) |
| Counterclaim Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ERIC FRYE, | ) |
| | ) |
| Counterclaim Defendant. | ) |

Draft Report: August 31, 2023
Date Submitted: April 24, 2023

## FINAL POST-TRIAL REPORT

Donald L. Gouge, Jr., DONALD L. GOUGE, JR. LLC, Wilmington, DE; *Plaintiff's attorney*

Charles J. Brown, GELLERT SCALI BUSENKELL & BROWN, LLC, Wilmington, DE; *Defendant's attorney*

Pending before me are competing claims of unjust enrichment arising from the use and maintenance (or lack thereof) of real property. The property owner contends the occupant failed to pay rent or properly maintain the property, which inured to the occupant's benefit, while detrimentally affecting the owner's interests. The property owner further contends the occupant wrongfully remained on the property after the owner told the occupant to vacate, amounting to trespass. The occupant disagrees that any rent was owed and, rather, contends he made substantial improvements to the property that have enriched the owner to the occupant's detriment. The occupant further contends he made payments toward the ultimate purchase of the property and should be compensated for the failed transaction. He also denies that his continued use and occupancy of the property supports a finding of trespass; even if it did, he argues there was no damage therefrom.

In this post-trial ruling, I recommend that judgment be awarded to the owner and against the occupant. I find that the use-and-occupancy relationship was informal and only expressly contemplated rent for one parcel. The other parcels were used in exchange for maintenance. I find equity does not compel payment for rent never contemplated, nor reimbursement for maintenance expressly contemplated. But the equities shifted once the owner revoked the permission granted to the occupant, and the occupant's continued use and occupancy (although not trespass) unjustly enriched the occupant to the owner's detriment. To rebalance the equities,

1

I recommend judgment against the occupant and in favor of the owner in the amount of $44,000.00.

## I. BACKGROUND[1]

The property owner in this action was Marvyn Raphaelson. Mr. Raphaelson passed during the pendency of this action, and his estate (the "Defendant") has been substituted in his place.[2] Eric Frye (the "Plaintiff") was Mr. Raphaelson's friend and occupant at various properties in Wilmington, Delaware. I begin with their historical relationship, building up to the dispute before me.

### A. The Early Years

The Plaintiff first became familiar with Mr. Raphaelson and Mr. Raphaelson's business and properties when the Plaintiff was just a child.[3] After finishing the tenth grade, the Plaintiff went to work at his family's automotive parts business, Continental Auto S&S, Salvage and Sales.[4] Mr. Raphaelson was in a similar line of

---

[1] The facts in this report reflect my findings based on the record developed at trial on December 14, 2022. *See* Docket Item ("D.I.") 70. I grant the evidence the weight and credibility I find it deserves. Citations to the trial transcript are in the form "Tr. #." The parties' jointly submitted exhibits are cited as "JX __."

[2] Mr. Raphaelson's brother, Bernard Raphaelson, was also named as a defendant. D.I. 1. But he was already deceased when this action was initiated and was removed from the case before trial. *See* D.I. 69.

[3] Tr. 9:10–11.

[4] Tr. 6:15–7:4.

work: salvage and recycling. Thus, while working at his family's business, the Plaintiff would take recyclable items to Mr. Raphaelson's business.[5]

But the Plaintiff and Mr. Raphaelson did not grow close until much later in their lives. It was the Plaintiff's decision, in his forties, to enter Mr. Raphaelson's line of work that brought them back together. The Plaintiff worked within the automotive business "for most of [his] life[.]"[6] But when he reached his forties, the Plaintiff "got into heavier trucks, and then [he] went into . . . the salvage/recycling business."[7]

The Plaintiff's new business venture started in earnest in 2004 or 2006. At that time, he and his business partner turned to Mr. Raphaelson. Both partners were familiar with Mr. Raphaelson—the Plaintiff from his family's prior business with Mr. Raphaelson, and his partner from a longstanding personal friendship with Mr. Raphaelson. As the Plaintiff explained it, Mr. Raphaelson "was very close to [the Plaintiff's] partner, Joe, for years, maybe 40 years."[8] With these connections, Mr. Raphaelson "showed [the Plaintiff and his partner] the ropes and basically put [them] in business."[9]

---

[5] Tr. 9:8–20.

[6] Tr. 7:10–12, 23–24.

[7] Tr. 7:24–8:2.

[8] Tr. 10:16–17.

[9] Tr. 10:14–16.

That support included Mr. Raphaelson's renting property to the Plaintiff and his partner. The property was Mr. Raphaelson's existing salvage yard at 20 Commerce Street in Wilmington, Delaware (the "Scrapyard").[10] The Scrapyard was a relatively large, industrial flat lot with a warehouse and an office.[11]

In 2004 or 2006, the Plaintiff and his partner took an interest in the Scrapyard. They installed "a brand-new scale . . . because the other scale was gone[,]" and cleaned up the debris left from a prior tenant of Mr. Raphaelson.[12] They then rented the Scrapyard from Mr. Raphaelson until 2008 or 2009.[13] Every month Mr. Raphaelson would stop by and pick up the agreed-upon rent: $4,500.00.[14]

For reasons unknown, the Plaintiff and his partner left the Scrapyard and moved their business to a location on New Castle Avenue in 2008 or 2009.[15] But,

---

[10] Tr. 8:10. The Scrapyard had a long history before the Plaintiff entered the scene. As the Plaintiff explained it, starting in the 1890s, the adjacent refinery would provide the Raphaelson family with scraps that the refinery did not want. Tr. 16:23–17:2. The Raphaelsons "would scrap and make money; and what they couldn't get, they would either bury, pile it up, or find someplace to put it out of the way." Tr. 17:3–5. After this historical family use, Mr. Raphaelson began renting the Scrapyard. *See* Tr. 14:6–7.

[11] Tr. 12:13–24, 111:10–15. The Plaintiff estimates the building at the Scrapyard was 80 feet by 50 feet. Tr. 13:1–4.

[12] Tr. 13:13–20. Per the Plaintiff, the prior tenant "left a huge mess[,]" and had to be evicted. Tr. 14:4–7.

[13] Tr. 10:3–10.

[14] Tr. 12:8–12.

[15] It is unclear when, precisely, this move occurred. *Compare* Tr. 8:14–17 (Plaintiff) (testifying that the New Castle Avenue business was not until 2012 or 2013) *with* Tr. 17:19–20 (Plaintiff) ("So after we left Commerce Street, we moved to New Castle

4

with them gone, problems arose at the Scrapyard. "People started knocking the gates down, they would dump all over Commerce Street[.]"[16] The same started happening at Mr. Raphaelson's property across the street at 110 Dock Street.[17]

The Plaintiff did not use 110 Dock Street while he and his partner rented the Scrapyard. But 100 Dock Street and 110 Dock Street (together, the "Dock Street Properties") were also owned by Mr. Raphaelson and located "[d]irectly across the street" from the Scrapyard.[18] The Dock Street Properties were much smaller than the Scrapyard, by a factor of three or four, and included a smaller building than the Scrapyard.[19] But, at least at some point in time, the Dock Street Properties handled the same type of salvage and recycling business as that conducted at the Scrapyard.[20]

After the Plaintiff and his partner left the Scrapyard, people "knocked the gates down at [the Dock Street Properties] and were dumping and stealing the fences,

---

Avenue."). The Plaintiff also testified that he sold his scrap business around 2011 for $1.8 million, pre-tax. Tr. 91:23–94:12.

[16] Tr. 17:20–22.

[17] Tr. 17:22–24.

[18] *See* Tr. 11:9–11. Mr. Raphaelson purchased the Dock Street Properties around 1980. Tr. 100:22–24.

[19] Tr. 12:13–19. *Compare* Tr. 13:1–4 *with* Tr. 13:5–8.

[20] *See* Tr. 17:10–16, 101:9–14. Mr. Raphaelson's son testified that he worked with his father on the Dock Street Properties from around 1994 to 1996. Tr. 101:15–21. In that role the son, Mark Raphaelson, "purchased and weighed metal[,] . . . moved metal around the yard, loaded trucks, . . . and [he] did sales and [he] drove a truck." Tr. 102:9–15.

stealing the electric. [They s]tole the aluminum off the roof. . . . [I]t was just a mess."[21]

Mr. Raphaelson, who lived in the Poconos at the time, turned to the Plaintiff for help.[22] As the Plaintiff explained it, he and Mr. Raphaelson "built a relationship" such that if Mr. Raphaelson "needed something, [the Plaintiff would] help him" and vice versa.[23] They "became very close" and "talked at least twice a week[.]"[24] In these talks, Mr. Raphaelson asked the Plaintiff to put gates up for the Scrapyard and the Dock Street Properties so that they looked occupied.[25] The Plaintiff did so, and helped Mr. Raphaelson maintain those properties and find tenants.[26] Eventually, the Plaintiff also helped Mr. Raphaelson sell the Scrapyard.[27] But the Dock Street Properties remained a thorn in Mr. Raphaelson's side.

With Mr. Raphaelson out of town the Plaintiff was called upon to address the day-by-day struggles at the Dock Street Properties. One such struggle was the roof

---

[21] Tr. 17:22–18:1. Although Mr. Raphaelson's family had previously helped with the fencing, they stopped doing so once the Plaintiff and his partner left the Scrapyard. Tr. 92:4–23.

[22] Tr. 18:21–24.

[23] Tr. 19:12–14.

[24] Tr. 19:14–15.

[25] Tr. 18:8–10.

[26] Tr. 18:15–19:1. Per the Plaintiff, his maintenance was toward ultimate ownership of the Dock Street Properties because Mr. Raphaelson told him: "eventually it's just going to be yours, because you can actually use it. It's just a thorn in my side." Tr. 19:4–8.

[27] Tr. 19:18–23.

6

on the building at the Dock Street Properties. "The roof on the building was very poor."[28] The Plaintiff patched it as much as he could, but "[i]t needed to be totally restored," something Mr. Raphaelson was uninterested in.[29] The Plaintiff also repaired the siding on the front and back of the building throughout the years.[30]

Another struggle related to tenants at the property. At one point in time, there was a trucking company doing business on the Dock Street Properties, as a tenant of Mr. Raphaelson.[31] Mr. Raphaelson had the tenant evicted and turned to the Plaintiff for clean up assistance once the tenant was out.[32] After that tenant was out, and the Plaintiff cleaned up, the Plaintiff began exclusively using and occupying the Dock Street Properties.[33]

### B.    The Plaintiff's Use & Occupancy

The Plaintiff began exclusively occupying and using the Dock Street Properties by 2016, at the latest.[34] When the Plaintiff moved onto the Dock Street

---

[28] Tr. 20:22–23.

[29] Tr. 20:24–21:11.

[30] Tr. 21:14–15.

[31] Tr. 16:3–5.

[32] Tr. 16:3–14.

[33] Tr. 16:15–18.

[34] The Plaintiff testified that by the time he was asked to vacate in 2021 he had been using the Dock Street Properties "for five years." Tr. 80:5. Presumably, then, he took up use and occupancy sometime in or around 2016. But this contradicts the Plaintiff's representations in discovery that he occupied "the Properties" since 2004. *See* JX 17 at 9.

Properties, he and Mr. Raphaelson did not sign a lease, nor is there any indication that they reached a definitive agreement on monthly rent.[35] But there is no dispute that the Plaintiff and Mr. Raphaelson agreed that the Plaintiff could use the Dock Street Properties if he kept them maintained.[36]

The Plaintiff testified that he used the Dock Street Property for storing his personal property.[37] He also allowed "[f]riends, relatives, associates" to store things on the Dock Street Properties.[38] That included the Plaintiff's son who "parked his dump truck [on the Dock Street Properties] from time to time."[39] These individuals did not pay any rent to Mr. Raphaelson.[40] Nor did the Plaintiff, although he made various payments to Mr. Raphaelson which are addressed below.[41]

---

[35] *Cf.* Tr. 117:7–9.

[36] *See* Tr. 118:23–119:2.

[37] Tr. 59:13–15. While the Plaintiff was occupying the Dock Street Properties, he maintained a "for sale or rent" sign. Tr. 59:2–5. The Plaintiff testified that Mr. Raphaelson requested the sign, although it was the Plaintiff's number listed as the point of contact. Tr. 59:2–8. The Plaintiff also confirmed that he kept a sign on his door that reflected the name and contact information for the Plaintiff's business, but he testified that it was only to ward off allegations that the Dock Street Properties were vacant. Tr. 64:19–65:4.

[38] Tr. 59:16–60:6. *See also* JX 23.

[39] Tr. 68:15–21.

[40] Tr. 60:4–6.

[41] Mr. Raphaelson's son, Mark Raphaelson, denies that his father would have allowed the Plaintiff to use the Dock Street Properties or the Commerce Property (as defined herein) rent free. *See* Tr. 112:5–13. Rather, per his son, Mr. Raphaelson expected rent of $4-5,000.00 a month. Tr. 139:15–18.

The Plaintiff also testified regarding business conducted on the Dock Street Properties. For example, the Plaintiff was asked to put "automobiles that had stickers from insurance companies" into a "Sealand container for shipping."[42] The automobiles were dropped off and the Plaintiff forklifted them into the container for shipping.[43] The Plaintiff denied, however, operating any of his businesses out of the Dock Street Properties, nor allowing others to do so.[44]

The Plaintiff's testimony was called into question by Mr. Raphaelson's son, Mark Raphaelson.[45] Mark testified that he used to drive by the Dock Street Properties "at least two times a week" during the fourteen years that he owned and operated Johnnie's Dog House on Concord Pike, in Wilmington.[46] He saw a "lot of activity going on."[47] There were cars being restored or processed, a food truck, dump trucks and lift trucks, "and it seemed like they were buying and selling so that there was some metal on there."[48]

---

[42] Tr. 65:15–66:8.

[43] Tr. 66:4–11. The Plaintiff could not recall how much he charged for the job. Tr. 66:17–20.

[44] Tr. 61:16–66:20, 68:15–24, 81:20–84:12.

[45] I refer to Mark Raphaelson by his first name to distinguish him from his father, whom I refer to as Mr. Raphaelson. No disrespect is intended.

[46] Tr. 104:8–12, 98:2–23, 136:3–9.

[47] Tr. 104:18.

[48] Tr. 104:22–105:10.

In addition to his drive-by observations, Mark stopped at the Dock Street Properties "four to six times" over the last five (5) years and spoke to those present.[49] He testified he did so "[b]ecause it was obvious there was a lot going on there, and [his] dad was not receiving any benefit from all th[e] people that were on the property."[50]

### C. The Attempted Purchase

In or around 2017, the Plaintiff and Mr. Raphaelson started discussing a sale of the Dock Street Properties from Mr. Raphaelson to the Plaintiff.[51] They began with a contemplated price of $240,000.00, and the Plaintiff attempted, in vain, to secure financing.[52] Ultimately, per the Plaintiff, Mr. Raphaelson agreed to lower the

---

[49] Tr. 105:18–21.

[50] Tr. 108:15–20. During one recent stop, Mark Raphaelson spoke with the Plaintiff directly. *See* Tr. 107:14–16. Around this time, Mr. Raphaelson was still living in the Poconos but would travel to Delaware on a regular basis. Tr. 108:21–24. On his trips, per Mark, Mr. Raphaelson "would drive down and try to find [the Plaintiff] to collect rent, and he basically came up empty every time[.]" Tr. 109:3–5.

[51] *See* Tr. 23:12–13. Another complication in the potential sale was that Mr. Raphaelson's brother, Bernard, was a co-owner of 100 Dock Street. D.I. 66(2)(A)(1).

[52] *See* Tr. 24:9–10, 30:16–17. Mark testified at trial regarding his opinion of the fair rental value of the Dock Street Properties. Before doing so, Mark laid the foundation that he would work on the Dock Street Properties during summers as a child and then, in his adulthood, he worked at the Dock Street Properties from 1994 to 1996. *See* Tr. 101:15–102:4. Before he moved to Utah around 2022, Mark lived in Rehoboth for a year and, before that, in West Chester, Pennsylvania for five to seven years. Tr. 97:20–98:13, 114:12–15. "For most of [his] career, [he] was a manufacturer's rep and [he] sold flooring to retailers in the Mid-Atlantic region, as well as [he] owned a restaurant on Concord Pike called Johnnie's Dog House." Tr. 98:20–23. It was his restaurant business that brought him by the Dock Street Properties "at least two times a week." Tr. 104:8–12. On "four to six" of those trips, he stopped at the Dock Street Properties to view them and speak to those

purchase price to $215,000.00 ($155,000.00 for 110 Dock Street and $60,000.00 for 100 Dock Street) and give the Plaintiff a mortgage.[53]

This purported agreement was memorialized in a handwritten document dated April 2, 2019 (the "Agreement"), which reads:

> Eric
> I found this survey plan
> Price for properties – 110 Dock St - 155,000.$^{00}$   >   total
>                              100 Dock St - 60,000.$^{00}$        $215,000.00
> You can use the 10 Commerce St Property when needed, but has to be kept cleaned up. When the Tower Co. has to get on the Property to service the Tower, you must them let in to the property and keep it cleaned up.[54]

It is undisputed that the primary handwriting on the Agreement is Mr. Raphaelson's or his wife's.[55]  In different handwriting is a notation: "165,000 PAID 15,000."[56] The Plaintiff testified the handwriting for that notation was "close to" his, but he was not sure.[57]

---

present thereon. Tr. 105:18–21. Based on his experience with the Dock Street Properties, his knowledge of the general vicinity, and his prior experience renting other properties, Mark testified that a fair rental value for the Dock Street Properties was $5,000.00. Tr. 110:1–14. *But see* Tr. 121:2–8 (Mark Raphaelson) (testifying inaccurately that the Dock Street Properties are around an acre). Mark Raphaelson testified that he believed $5,000.00 was "basically what [the Plaintiff] was collecting in cash from the existing tenants" at the Dock Street Properties. Tr. 124:20–22.

[53] *See* Tr. 24; JX 3.

[54] JX 3.

[55] *See* Tr. 23:14–22, 134:17–23.

[56] JX 3.

[57] Tr. 24:18–22.

The Plaintiff testified that he made monthly payments of $5,000.00 toward the purchase contemplated in the Agreement.[58] Those payments, per the Plaintiff, started on March 30, 2018, before the date of the Agreement.[59] They were all for $5,000.00 and, except for one cash payment, were paid from an account belonging to J.D.A.S., Inc.[60] The Plaintiff testified that J.D.A.S., Inc., "was one of [his] old companies[.]"[61] Altogether, the Plaintiff, through J.D.A.S., Inc. paid Mr. Raphaelson $25,000.00.[62] The Plaintiff testified these payments were all "towards the purchase of the [Dock Street Properties], plus owed taxes."[63]

In addition to these payments, the Plaintiff testified that he made improvements to the Dock Street Properties "in reliance on [his] belief that [he was] going to be buying the[m.]"[64] The first was to address flooding and ponding of water

---

[58] *See* Tr. 24:24–25:1.

[59] *Compare* JX 3 (April 2, 2019) *with* JX6 (May 30, 2018).

[60] *See* JX 4–7.

[61] Tr. 64:22–23.

[62] JX 4–7; Tr. 26:15–19. The Plaintiff testified that before 2018 he paid even more to Mr. Raphaelson, reflecting why the $240,000.00 price was reduced to $165,000.00 in the handwritten notation. Tr. 27:18–28:10. The Plaintiff did not, however, introduce any documentation in support. The Plaintiff also testified that he was holding more than $20,000.00 in an account belonging to Hook Equipment Sales, LLC "in anticipation of going to settlement[.]" Tr. 36:4–7; JX17, Ex. 4. Hook Equipment Sales, LLC "is a company that [the Plaintiff is] partners with that [he] was doing consulting for[.]" Tr. 36:20–21.

[63] Tr. 26:20–23. The Plaintiff confirmed that he was the one who deposited those checks into Mr. Raphaelson's account. *See* Tr. 54:20–55:22.

[64] Tr. 28:11–14.

on the Dock Street Properties. The Plaintiff explained that the Dock Street Properties had a ditch "that went down the entire front . . . , and it would fill with debris and tires and mud[.]"[65] He dug the mud out, added some 18- or 24-inch pipe he received form the Port of Wilmington, and paid for stone to cover the pipe.[66] The Plaintiff estimated he spent $20,000.00 on the ditch improvements, not including his labor and equipment use.[67] He also cleared the land, removing fifteen loads of debris, such as gas tanks and barbed wire, and "put stone and blacktop in so that . . . you could actually just drive across it without getting stuck or hitting something."[68] He estimated such a job would cost around $8,500.00, if he contracted out for it.[69] He also put up a steel fence for privacy.[70] Materials alone, he priced the steel fence at $3,700.00.[71] The Plaintiff did not, however, introduce any documentary evidence in support of these repairs or improvements.

### D.    The Commerce Property

Mr. Raphaelson owned, and the Plaintiff occupied, one additional property not yet addressed: 10 Commerce Street (the "Commerce Property"). The Commerce

---

[65] Tr. 28:21–24.

[66] Tr. 29:1–8.

[67] Tr. 31:5–7.

[68] Tr. 29:11–20.

[69] Tr. 32:11–14.

[70] Tr. 30:1–3.

[71] Tr. 32:15–20.

Property is "flatland, there's a cell phone tower on it, and it's fenced in."[72]  Mr. Raphaelson has owed the Commerce Property for decades.[73]

The Plaintiff testified that Mr. Raphaelson asked the Plaintiff to clean the Commerce Property, which "just looked horrible."[74]  The Plaintiff refused to do so for free and, per the Plaintiff, Mr. Raphaelson offered the Commerce Property to the Plaintiff, to rent "forever for a thousand dollars a month" if he cleaned up.[75] The Plaintiff estimated the cleanup would cost around $16,000.00 and testified that he and Mr. Raphaelson agreed that such amount would be taken from the monthly rent due.[76] The Plaintiff testified that he fulfilled his end of the bargain: he cleaned the Commerce Property, which cost him around $19,000.00, and thereafter used and occupied the Commerce Property.[77]  Despite confirming an agreement to pay rent, the Plaintiff did not present any evidence that he paid any rent to Mr. Raphaelson for his use or occupancy of the Commerce Property.

---

[72] Tr. 100:7–11.

[73] Tr. 100:20–22.

[74] Tr. 34:3–6.

[75] Tr. 34:10–12.

[76] Tr. 33:19–34:16.

[77] Tr. 34:17–20. The Plaintiff did not introduce any documentation is support of his valuation. *See* Tr. 42:20–24.  The Plaintiff testified that he had photos reflecting the clean up, but they were not introduced at trial. Tr. 44:17–24.

### E. The Falling Out

On April 3, 2020, counsel to Mr. Raphaelson sent the Plaintiff a letter purporting to revoke his license to use the Dock Street Properties and the Commerce Property (the "Revocation").[78] The Revocation explained that "Mr. Raphaelson had previously given [the Plaintiff] permission to occupy the [Dock Street Properties and the Commerce Property] on the express condition that the property be kept clean."[79] Because those properties had not been kept clean, the Revocation continued: "your license to use the properties is hereby revoked."[80] The Plaintiff was thus ordered "to remove all [of his] personal property . . . immediately."[81]

The Plaintiff testified that he called Mr. Raphaelson after receiving the Revocation.[82] Per the Plaintiff, Mr. Raphaelson recanted the Revocation and told the Plaintiff "not to worry about it."[83] Contrary to this alleged recanting, though, Mr. Raphaelson filed a summary possession complaint against the Plaintiff in the Justice of the Peace Court on April 15, 2021 (the "JP Action").[84] In his complaint, Mr. Raphaelson alleged that the Plaintiff occupied the Dock Street Properties and

---

[78] JX 8.

[79] JX 8.

[80] JX 8.

[81] JX 8.

[82] Tr. 37:22–23.

[83] Tr. 38:3–6.

[84] JX 9.

15

the Commerce Property "under a bare license agreement and not a lease."[85] Thus, Mr. Raphaelson sought possession and stated no claim for monetary relief (other than court costs of $45.00).[86]

On July 20, 2021, the JP Action was dismissed for lack of subject matter jurisdiction by Justice of the Peace Nina M. Bawa.[87] The Justice of the Peace explained in the notice of dismissal that because "the parties agree that [Mr. Raphaelson] gave [the Plaintiff] a license to occupy [the properties] in exchange for maintaining the units[,]" there was "insufficient evidence to show . . . a landlord-tenant relationship."[88] Without such relationship, the Justice of the Peace Court lacked jurisdiction.[89]

Less than three weeks after the JP Action was dismissed, on August 6, 2021, Mr. Raphaelson filed a complaint with the Superior Court seeking ejectment of the Plaintiff.[90] Mr. Raphaelson averred that the Plaintiff was continuing to use and

---

[85] *Id.*

[86] *Id.*

[87] JX 10.

[88] *Id.*

[89] *Id.*

[90] JX 19.

occupy the Dock Street Properties despite the Revocation and asked that the Superior Court enter judgment ejecting the Plaintiff.[91]

On December 26, 2021, while the ejectment action was pending, Mr. Raphaelson passed away.[92] His estate was, thus, substituted into the ejectment action through an amended complaint.[93] Through a stipulation filed on July 12, 2022 and so ordered on July 14, 2022, the Plaintiff agreed to vacate the Dock Street Properties by July 31, 2022.[94] He ultimately left during August 2022.[95]

When the Plaintiff left the Dock Street Properties, the building thereon was still in poor shape. There were "holes in the roof," "black plastic tarps for ceilings in each of the three bays in the building[,]" and the siding and fascia "was coming off the building[.]"[96] At Mark's request, Louis Fidanza, a general contractor, inspected the Dock Street Properties after the Plaintiff left.[97] He found what he

---

[91] *Id.* Counsel for Mr. Raphaelson had difficulty serving the Plaintiff with the Superior Court complaint. *See* JX 20, 21.

[92] Tr. 99:10–11. Mr. Raphaelson left the Dock Street Properties and the Commerce Property to his three children. Tr. 99:16–19.

[93] *See* JX 25.

[94] *Id.*

[95] Tr. 38:18–20. The Plaintiff explained that he cleaned and left the properties vacant, which took a while to accomplish. *Id.* The Plaintiff also testified that he was slowed down by COVID. Tr. 71:9–14, 75:19–24.

[96] Tr. 87:1–17. The Plaintiff testified that if he "had literally just thrown the keys to Mr. Raphaelson . . . in May or June of 2020," a contractor would be charged around $60,000.00 to conduct the clean out. Tr. 96:3–14.

[97] *See* Ex. P-1.

viewed as neglect of the building thereon; siding was missing the roof was in "pretty bad shape," the soffits were gone, and those conditions, in his opinion, did not "happen overnight[.]"[98] He estimated, as of August 2022, repairs would cost $17,225.00.[99] Mr. Fidanza has not been retained to perform those repairs, however, he was "simply asked to come out and take a look at the property, [and] give an estimate."[100]

### F. Procedural History

On May 1, 2020, the Plaintiff initiated this action through a complaint against Mr. Raphaelson and Mr. Raphaelson's brother, Bernard Raphaelson.[101] The Plaintiff pled four (4) counts for: (1) specific performance of the Agreement, (2) damages for breach of the Agreement, (3) unjust enrichment, and (4) breach of the implied covenant of good faith and fair dealing.

Mr. Raphaelson moved to dismiss the complaint on July 1, 2020.[102] After the motion was fully briefed, argued, and exceptions to my draft report were withdrawn, I issued a final report on May 3, 2021.[103] In my final report, I recommended that the

---

[98] Tr. 146:10–22.

[99] Ex. P-1.

[100] Tr. 149:19–150:3.

[101] D.I. 1.

[102] D.I. 5.

[103] D.I. 23.

contract claims (Counts I, II, and IV) be dismissed; the Chancellor adopted such recommendation on May 20, 2021.[104] Thereafter, on July 22, 2021, Mr. Raphaelson filed an answer and three (3) counterclaims for: (1) trespass, (2) unjust enrichment, and (3) injunctive relief.[105] The Plaintiff answered the counterclaims on September 9, 2021.[106]

On July 14, 2022, I issued a schedule, setting trial for December 2022.[107] On October 7, 2022, the Plaintiff filed a motion seeking summary judgment on the counterclaims.[108] The motion was fully briefed on November 22, 2022 and on December 6, 2022, at the pretrial conference, I issued an oral ruling granting the motion in part.[109] Therein, I recommended that the counterclaim for injunctive relief be dismissed as moot, clarified that punitive damages are unavailable, and declined to rule on the unjust enrichment and trespass counterclaims, finding further factual inquiry at trial advisable.[110] I stayed exceptions to that ruling in light of the impending trial.[111]

---

[104] D.I. 23–24.

[105] D.I. 25.

[106] D.I. 29.

[107] D.I. 44.

[108] D.I. 49.

[109] D.I. 56, 71.

[110] D.I. 65, 71.

[111] D.I. 71 at 9:5–8.

On December 13, 2022, I approved the parties' stipulation to substitute in the Mr. Raphaelson's estate, in light of his passing, and remove Bernard Raphaelson as a defendant.[112] With the proper party in place, the remaining claim and counterclaims were tried on December 14, 2022.[113] Following trial, the parties submitted post-trial briefs.[114] Briefing was complete on April 24, 2023, at which time I took this case under advisement.[115] This is my final post-trial report.

## II. ANALYSIS

The parties state competing claims for unjust enrichment, with the Defendant adding a trespass claim to the mix.

> The parties have the burden of proving their respective claims at trial by a preponderance of the evidence. "Proof by a preponderance of the evidence means proof that something is more likely than not." This "means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not. By implication, the preponderance of the evidence standard also means that if the evidence is in equipoise, [the advancing party] lose[s]."[116]

I begin with the unjust enrichment claims, then turn to trespass.

---

[112] D.I. 69.

[113] D.I. 70.

[114] D.I. 76, 77, 80, 81.

[115] D.I. 81.

[116] *Schaeffer v. Lockwood*, 2021 WL 5579050, at *15 (Del. Ch. Nov. 30, 2021), judgment entered, (Del. Ch. 2022).

20

**A.** **The Plaintiff's unjust enrichment claim should be denied; the Defendant's should be granted in part, denied in part.**

Unjust enrichment is the "unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."[117] To succeed on their competing claims for unjust enrichment, the parties must prove five (5) elements: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."[118] "The fifth element need only be established if there is a dispute over jurisdiction."[119]

Here, both sides argue that the other was unjustly enriched by the Plaintiff's use and occupancy of the Dock Street Properties and Commerce Property. The Plaintiff argues he has been impoverished, and the Defendant has been enriched, by at least $70,000.00. This amount includes: (1) the $25,000.00 in payments to Mr. Raphaelson by check or cash, which the Plaintiff contends were toward the sale of the Dock Street Properties, (2) costs to repair and improve the Dock Street Properties of $32,200.00, and (3) costs to clean up the Commerce Property, which Mr. Raphaelson and the Plaintiff agreed would be $16,000.00. The Defendant counters

---

[117] *Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999).

[118] *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010) (citations omitted).

[119] *Restanca, LLC v. House of Lithium, Ltd.*, 2023 WL 4306074, at *34 (Del. Ch. June 30, 2023), judgment entered, (Del. Ch. 2023) (citing *Garfield v. Allen*, 277 A.3d 296, 351 (Del. Ch. 2022)).

21

that the Plaintiff was enriched by using the Dock Street Properties and the Commerce Property from January 2020 through August 2022 without paying rent and seeks compensation of $160,000.00 ($5,000.00 for each month). There is no dispute that these competing claims include an enrichment, and a related impoverishment. Nor is there any dispute about jurisdiction. Thus, the success of these claims turns on the absence-of-justification element. I find justification weighs differently before and after the Revocation; I address those time periods, and the relief warranted therefrom, in turn.

1. **Neither side has proven unjust enrichment before the Revocation.**

The Revocation was issued on April 3, 2020. Both sides claim unjust enrichment before then, with (1) the Plaintiff seeking repayment for $25,000.00 he paid to Mr. Raphaelson between 2018 and 2019, (2) the Plaintiff claiming costs to repair or maintain the Dock Street Properties, (3) the Plaintiff seeking the costs to clean up the Commerce Property, which was completed no later than April 2019, and (4) the Defendant seeking rent from January 2020 through April 2020. Whether these expenditures (or lack thereof) were justified depends on the totality of the circumstances that existed before the Revocation.

Until the Revocation, the Plaintiff and Mr. Raphaelson were operating under their agreement that the Plaintiff could use the Dock Street Properties if the Plaintiff

22

maintained those properties.[120]  With these understandings clear from the record, the Plaintiff failed to prove that his maintenance and repair expenses were without justification.  Likewise, the Defendant failed to prove that the Plaintiff's failure to pay rent for the Dock Street Properties (until the Revocation) was without justification.

That leaves the Plaintiff's payments to Mr. Raphaelson and the claim for rent for the Commerce Property.  I find neither support unjust enrichment before the Revocation.

The Plaintiff's argument for repayment of the total $25,000.00 he paid to Mr. Raphaelson rests on two unproven premises: that the funds were (1) paid toward purchasing the Dock Street Properties and (2) reimbursable if the sale did not go through. The evidence adduced at trial supports neither by the required preponderance of the evidence.

The Plaintiff asks me to accept his unsupported testimony that he paid the $25,000.00 toward the Agreement.  But the Agreement does not reflect the installment-like structure the Plaintiff proffers.  And the payments the Plaintiff relies upon were incurred both before and after the Agreement was purportedly reached.

---

[120] The Defendant appears to argue that there was an agreement that the Plaintiff would pay rent for the Dock Street Properties. Tr. 135:21–136:1. The record supports no such agreement, which is further belied by the Defendant's representations in the JP Action. *See* JX 9.

The payments were also made on a sporadic schedule. The evidence does not support a finding that the $25,000.00 payments were, more likely than not, solely toward consummation of the Agreement.

Even if it did, the Plaintiff has failed to prove that the Defendant would not be justified in retaining the payments. The Plaintiff would have me read refundability into the Agreement, without any evidentiary support that the parties contemplated such refundability. And, on the record before me, it would be unreasonable to assume refundability.

Finally, regarding the Commerce Property, the Plaintiff admitted that he and Mr. Raphaelson agreed that the Plaintiff would clean up the Commerce Property and that the anticipated cost of clean up ($16,000.00) would go toward the agreed monthly rent of $1,000.00. The Defendant failed to introduce any persuasive evidence to the contrary. Accepting this unrebutted testimony, the Plaintiff would be fully compensated for the clean up after 16 months of use and occupancy of the Commerce Property. At the latest, the Plaintiff was authorized to use the Commerce Property by April 2, 2019, as reflected in the Agreement. The Plaintiff testified that the clean up at the Commerce Property took about five (5) months, meaning by December 2, 2019, at the latest, the Commerce Property was cleaned up and the Plaintiff was fully occupying it. Thus, it was not until April 2, 2021, that the cleanup costs were fully paid through the Plaintiff's continued use and occupancy of the

24

Commerce Property. The Defendant has, thus, failed to prove unjust enrichment based on the Plaintiff's use and occupancy of the Commerce Property before the Revocation.

### 2. After the Revocation, the Plaintiff was unjustly enriched by his continued use and occupancy of the properties.

The Defendant also claims unjust enrichment after the Revocation. The Revocation clearly and unequivocally revoked any prior agreements between the Plaintiff and Mr. Raphaelson, and the Plaintiff was ordered to vacate the properties.[121] Without an agreement to use in exchange for maintenance and repairs, the Defendant's request for rent is much more viable. The Plaintiff makes two arguments in response: (1) the license became irrevocable, rendering the Revocation ineffective unless approved by a court of competent jurisdiction or (2) that the Defendant has failed to introduce sufficient evidence to quantify the enrichment and determine an appropriate judgment. I address these in turn.

First, I find the license remained revocable. "A license with respect to real property is 'a privilege to go on the premises for a certain purpose, as, for example, the purpose specified in the instrument creating the license; it does not operate to confer on, or vest in, the licensee any title, interest, or estate in such property.'"[122]

---

[121] I find the Plaintiff's testimony that Mr. Raphaelson told him not to worry about the Revocation difficult to believe and undermined by the JP Action and Superior Court filings.

[122] *Timmons v. Cropper*, 172 A.2d 757, 759 (Del. Ch. 1961) (quoting 53 C.J.S. Licenses § 84, p. 810).

Ordinarily, licenses are "terminable at the will of the owner."[123] But a license "can vest enforceable rights in the grantee if the court is convinced that the grant of use was reasonably relied upon and that the parties intended the grant to be permanent."[124] Whether a license should be held permanent depends on "the intent of the parties, . . . the circumstances of the particular case, and may be wholly countervailed by evidence demonstrative that the privilege in question was in fact granted and accepted not as a perpetual, indefeasible right, but as a voluntary accommodation, to abide the good will and mutual interests of the parties."[125]

Here, the Plaintiff failed to adduce evidence that the license was intended to be permanent. As already addressed, the relationship between the Plaintiff and Mr. Raphaelson was close and friendly. Their arrangements regarding the Dock Street Properties were, thus, informal. But that informality had a clear understanding—the Plaintiff could use and occupy the Dock Street Properties, without the payment of rent but providing a benefit over leaving the property vacant, if he maintained them. His maintenance costs were, thus, expressly contemplated in the license for his use and I find the post hoc attempts by the parties to convert the license into anything more are unsupported and unpersuasive.

---

[123] *Coker v. Walker*, 2013 WL 1858098, at *3 (Del. Ch. May 3, 2013).

[124] *Hionis v. Shipp*, 2005 WL 1490455, at *4 (Del. Ch. June 16, 2005), *aff'd*, 903 A.2d 323 (Del. 2006).

[125] *Jackson v. Phila., Wilm. & Balt. R.R. Co.*, 1871 WL 2084, at *5 (Del. Ch. Sept. 1, 1871).

Thus, the license remained revocable, and I find the Revocation was clear and unambiguous. Despite the Revocation, the Plaintiff continued to use and occupy the Properties until August 2022. I find such was without justification and the Plaintiff was unjustly enriched by remaining on the Dock Street Properties without compensating Mr. Raphaelson or the Defendant for his use and occupancy thereof.

That brings me to the second point of contention—how to quantify that unjust enrichment. "Once liability has been found, and the court's powers shift to the appropriate remedy, the Court of Chancery has broad discretion to craft a remedy to address the wrong."[126] "The most likely measure for damages under an unjust enrichment claim would be the amount by which [the Plaintiff] was unjustly enriched."[127]

There appears to be no dispute that, here, a proper measure of damages for the unjustified use and occupancy of the properties would be the amount of rent the Plaintiff would otherwise have had to pay for such use and occupancy. The Defendant seeks monthly rent in the amount of $5,000.00. For the reasons explained above, the Defendant should be awarded the agreed $1,000.00 rent for the

---

[126] *Brinckerhoff v. Enbridge Energy Co., Inc.*, 159 A.3d 242, 262 (Del. 2017, revised Mar. 28, 2017).

[127] *Mehta v. Smurfit-Stone Container Corp.*, 2014 WL 5438534, at *6 (Del. Ch. Oct. 20, 2014, revised May 24, 2011).

Commerce Property from April 2021 through August 2022 ($16,000.00). But the question of rent for the Dock Street Properties is less clear.

To quantify that amount, the Defendant proffered one witness: Mark, Mr. Raphaelson's son, and his heir and successor in interest to the Dock Street Properties. I find Mark's testimony admissible, but ultimately unpersuasive.

The Delaware Supreme Court in *State ex rel. Smith v. 0.15 Acres of Land*, clarified "that unless it is clearly shown that the owner has no knowledge of the value of his property, he should be permitted to testify as to its market value."[128] The Court, however, went on to recognize "[t]he fact that in many instances such testimony is of little value goes to the weight of such testimony and not to its admissibility."[129]

Then-Master Griffin addressed this balance in *In re Real Estate of Hunsucker*.[130] Therein, she admitted testimony from a co-owner about their property's rental value finding "it reasonable, under the circumstances, to use the lay testimony provided as the basis for rental value" in the case before her.[131] Such case was a partition proceeding, where the co-owner testified that he researched rental

---

[128] 169 A.2d 256, 258 (Del. 1961).

[129] *Id.*

[130] 2019 WL 1984242, at *4 (Del. Ch. May 3, 2019).

[131] *Id.*

values in the area and discounted the average amount reflected in his research based on the condition of the property at issue.[132]

But the owner before me failed to take those extra steps to support his lay testimony. Mark testified that his experience with the Dock Street Properties, the area, and rental properties, in general, supported $5,000.00 as a fair rental value. When asked to clarify how he reached the $5,000.00 amount, though, Mark could not provide any explanation. The closest he came to an explanation was his recollection of discussions with Mr. Raphaelson where, per Mark, Mr. Raphaelson said he expected rent of $4-5,000.00 from the Plaintiff. As already explained, I find it is more likely than not that Mr. Raphaelson did not expect monthly rent for the Plaintiff's use of the Dock Street Properties. Thus, this testimony does little to support a fair rental amount. Mark's testimony was also undermined by his lack of knowledge about the size of the Dock Street Properties or their zoning limitations. Thus, I find under the circumstances Mark's testimony as to the rental value should be given little, if any, weight.

Without Mark's testimony, I must determine if and to what extent damages can be assessed. The burden of proof by a preponderance of the evidence rests with

---

[132] *Id.*

the Defendant, but "Delaware does not require certainty in the award of damages where a wrong has been proven and injury established."[133]

> Responsible estimates of damages that lack mathematical certainty are permissible so long as the court has a basis to make such a responsible estimate. Public policy has led Delaware courts to show a general willingness to make a wrongdoer "bear the risk of uncertainty of a damages calculation where the calculation cannot be mathematically proven." Nevertheless, when acting as the fact finder, this Court may not set damages based on mere "speculation or conjecture" where a plaintiff fails to adequately prove damages.[134]

Here, I find I can make a responsible estimate of the minimum rental value of the Dock Street Properties. The record reflects that the Dock Street Properties were in poor condition throughout and after the Plaintiff's use and occupancy. Likely due to that condition, Mr. Raphaelson did not charge the Plaintiff any rent for his use. What he may have charged prior tenants is unclear. But the Plaintiff admits that Mr. Raphaelson valued the Commerce Property, which is comparable to the Dock Street Properties, at $1,000.00 per month. Thus, I find it is equitable under the circumstances to use the agreed rent for the Commerce Property as an estimate of the fair rental value for the Dock Street Properties. Judgment should thus be entered against the Plaintiff and in favor of the Defendant in the amount of $1,000 each month from May 2020 (the month after the Revocation) to August 2022 (the month

---

[133] *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 613 (Del. Ch. Apr. 23, 2010), *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010) (citations omitted).
[134] *Id.*

the Plaintiff vacated) ($28,000.00, and with the Commerce Property rent recommended above, $44,000.00).

**B.    The Plaintiff should not be held liable for trespass.**

The Defendant argues that the Plaintiff's failure to vacate the Dock Street Properties when directed to do so in 2020 and continued use and occupancy thereof until August 2022 amounts to trespass.  I disagree.

To succeed on a claim for trespass to real property, the Defendant must prove three (3) elements: "(1) the [Defendant] must have lawful possession of the property; (2) the [Plaintiff] must have entered onto the [Defendant's] land without consent or privilege; and (3) the [Defendant] must show damages."[135]  All three elements are disputed.  Finding possession lacking, I recommend judgment in favor of the Plaintiff and decline to address the remaining elements.

The Delaware Supreme Court recently addressed the possession requirement for a trespass claim in *State ex rel. Jennings v. Monsanto Co., Solutia, Inc.*[136] The court first looked to Section 157 of the Restatement (Second) of Torts, which defines possession, for purposes of trespass, as one who:

> (a) is in occupancy of land with intent to control it, or (b) has been but no longer is in occupancy of land with intent to control it, if, after he has ceased his occupancy without abandoning the land, no other person has obtained possession as stated in Clause (a), or (c) has the right as

---

[135] *O'Bier v. JBS Constr., LLC*, 2012 WL 1495330, at *2 (Del. Super. Apr. 20, 2012).

[136] 2023 WL 4139127, at *11 (Del. June 22, 2023).

31

against all persons to immediate occupancy of land, if no other person is in possession as stated in Clauses (a) and (b).[137]

The court went on to explain:

> The Second Restatement defines "occupancy" as "acts done upon the land as manifest a claim of *exclusive control* of the land, and indicate to the public that he who has done them has appropriated it." The Second Restatement also states that "[t]he word 'intrusion' is used throughout the Restatement of this Subject to denote the fact that the possessor's interest in the *exclusive possession* of his land has been invaded by the presence of a person or thing upon it without the possessor's consent." Under Delaware law, "[o]nly a person in possession of the property may allege a trespass action."[138]

I apply that standard here and find the Defendant was not in possession of the Dock Street Properties while the Plaintiff allegedly trespassed thereon, defeating the trespass claim.

The Plaintiff is alleged to have trespassed on the Dock Street Properties from April 2020, when he was told to vacate, until August 2022, when he finally vacated. But during that time, neither Mr. Raphaelson, nor his successors in interest, were in possession of the land. They did not occupy it and, although they had the right to so occupy, the Plaintiff was the party in actual possession and occupancy, holding over from the prior license granted to him. Because neither Mr. Raphaelson, nor his

---

[137] Restatement (Second) of Torts § 157 (Am. L. Inst. 1965).

[138] *State ex rel. Jennings v. Monsanto Co., Solutia, Inc.*, 2023 WL 4139127, at *11 (Del. 2023) (citations omitted) (emphasis in original).

successors interest, had lawful possession of the property at the time of the alleged trespass, the trespass claim must fail.

## III.   CONCLUSION

For the foregoing reasons, I find the Plaintiff's remaining claim for unjust enrichment should fail.   As should the Defendant's claim for trespass. The Defendant's counterclaim for unjust enrichment should be granted in part and judgment should be entered in the Defendant's favor, against the Plaintiff, for $44,000.00.   As the prevailing party, the Defendant should also be awarded costs under Court of Chancery Rule 54(d).[139]

This is my final report and exceptions may be filed under Court of Chancery Rule 144.  Any stay on interim recommendations is hereby lifted.

---

[139] *See Brandin v. Gottlieb*, 2000 WL 1005954, at *27 (Del. Ch. July 13, 2000) (explaining a party "who has prevailed on most of her claims, is appropriately deemed a prevailing party, and the court may award costs to her").